**COOPER LABORATORIES, INC.,**
Petitioner,

v.

**COMMISSIONER, FEDERAL FOOD AND DRUG ADMINISTRATION,**
Respondent.

No. 72–1866.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 18, 1973.

Decided April 19, 1974.

Rehearing Denied June 26, 1974.

---

25. Secretary's Br. at 17.

William R. Pendergast, Washington, D.C., for petitioner.

Howard S. Epstein, Atty., Dept. of Justice, with whom Peter Barton Hutt, Asst. Gen. Counsel, Food, Drugs and Product Safety Division, Food and Drug Administration, Joanne S. Sisk, Chief, Appellate and Special Proceedings Branch, Food and Drug Administration, and Jay H. Geller, Atty., Dept. of Health, Education and Welfare, were on the brief, for respondent.

Before WRIGHT and LEVENTHAL, Circuit Judges, and MATTHEWS,* Senior District Judge.

J. SKELLY WRIGHT, Circuit Judge:

To be marketed in interstate commerce under the Food, Drug and Cosmetic Act, a drug must generally be covered by a "new drug application" (NDA) approved by the Food and Drug Administration (FDA).[1] In 1944 the FDA approved an NDA for Protamide, an injectible colloidal solution of dena-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 294(c) (1970).

1. 21 U.S.C. § 355(a) (1970). Drugs needing approved NDAs to flow in commerce are rather misleadingly termed "new drugs" as defined at 21 U.S.C. § 321(p) (1970).

tured proteolytic enzyme, upon a finding that the drug was safe for human use, and Protamide was thereafter marketed for symptomatic treatment of herpes zoster (popularly known as shingles), ophthalmic herpes zoster, tabes dorsalis, and neuritis.[2] The 1962 amendments to the Act[3] required the FDA to withdraw approval from any NDA where "substantial evidence" of the drug's effectiveness was lacking, 21 U.S.C. § 355(e)(3) (Supp. II 1972), and placed the burden of coming forward with such evidence on the drug companies.[4] After several FDA requests, Cooper Laboratories, the maker of Protamide, submitted various documents purporting to establish the drug's effectiveness. Having analyzed this submission, the FDA on August 25, 1972 withdrew approval from Cooper's NDA, finding that the proffered materials did not constitute substantial evidence of efficacy.[5] On appeal Cooper asserts that the Administration should have granted it a hearing before acting.

The 1962 amendments define "substantial evidence" as "consisting of adequate and well-controlled investigations, including clinical investigations," 21 U. S.C. § 355(d) (1970), a standard explicated in considerable detail by FDA reg-

ulations promulgated in 1970, 21 C.F.R. § 130.12(a)(5) (April 1, 1973). While the amendments speak of FDA action "after due notice and opportunity for hearing," 21 U.S.C. § 355(e), the Administration has established summary procedures for finding a drug ineffective where the applicant's proffered evidence clearly does not include "adequate and well-controlled investigations" and thus does not raise a "genuine and substantial issue of fact" requiring a hearing.[6] The Supreme Court has recently construed these procedural regulations and declared them lawful.[7] The narrow question before us is whether the FDA's recourse to summary procedures was proper, given the evidence submitted to the Administration by Cooper. We find that it was and affirm the FDA's order of August 25, 1972 in all respects.

## I. ADMINISTRATIVE HISTORY OF THE CASE

The 1962 amendments required the FDA to reevaluate more than 4,000 outstanding NDAs which had been approved solely on safety grounds since the passage of the Food, Drug and Cosmetic Act in 1938.[8] To simplify this task, the Administration engaged the

---

2. The NDA was originally held by Fuller Laboratories. The label indications for herpes zoster, tabes dorsalis, and neuritis were ordered deleted by the FDA in 1969, 34 Fed.Reg. 5753 (March 27, 1969). The record on appeal does not contain past or recent labels used with Protamide or indicate the content or tenor of Cooper's advertising for the drug. Cooper does claim, however, that it ceased active promotion of the drug some time before 1970. *See* note 11 *infra.*

3. Drug Amendments of 1962 (Harris-Kefauver Act), 76 Stat. 780, amending 21 U.S.C. § 301 *et seq.*

4. On the burden of coming forward, *see* Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 617, 93 S.Ct. 2469, 37 L. Ed.2d 207 (1973). *See also* 21 C.F.R. § 130.14(b) (April 1, 1973).

5. Protamide: Final Order on Objections and Request for a Hearing Regarding Withdrawal of Approval of New-Drug Application, 37

Fed.Reg. 17227 (Aug. 25, 1972) (hereinafter "Final Order"). FDA orders refusing or withdrawing approval from NDAs are reviewable by Courts of Appeals. 21 U.S.C. § 355(h) (1970).

6. It is stated in 21 C.F.R. § 130.14(b):
 When it clearly appears from the data in the application and from the reasons and factual analysis in the request for the hearing that there is no genuine and substantial issue of fact which precludes the refusal to approve the application or the withdrawal of approval of the application, e. g., no adequate and well-controlled clinical investigations to support the claims of effectiveness have been identified, the Commissioner will enter an order on this data, making findings and conclusions on such data.

7. *Hynson, supra* note 4, 412 U.S. at 618–622, 93 S.Ct. 2469.

8. More than 9,000 NDAs were deemed effective in that period, but about half of those

National Academy of Science—National Research Council in 1966 to create expert panels for preliminary screening of the effectiveness of these drugs; holders of NDAs were invited to submit data supporting the efficacy of their drugs.[9] Protamide was evaluated by three such panels, which reported their conclusions in 1969. The Panel on Neurological Drugs found Protamide "ineffective" for neuritis and herpes zoster; the Panel on Drugs Used in Dermatology III found the drug "ineffective" for herpes zoster; and the Panel on Drugs Used in Ophthalmology found the drug "possibly effective" for treatment of ophthalmic herpes zoster.[10]

Citing these findings, the FDA in March 1969 required the maker of Protamide to delete label "indications [for] neuritis, herpes zoster, and tabes dorsalis," and to provide, within six months, "substantial evidence of effectiveness of the drug for use in ophthalmic herpes zoster." 34 Fed.Reg. 5753 (March 27, 1969).[11] Receiving no reply, the FDA in December 1969 notified the maker of Protamide that withdrawal proceedings would be initiated. 35 Fed.Reg. 11535 (July 17, 1970). It gave Cooper 30 days to request a hearing and to submit evidence of efficacy, warning that a hearing would be denied if Cooper's submission revealed "no genuine and substantial issue of fact."

Cooper made a timely request for a hearing and submitted three types of evidence to show Protamide's efficacy in treating various illnesses.

(1) By sworn affidavits, similarly worded, five licensed physicians testified that they had found Protamide effective in treating herpes zoster in their clinical practices. They further stated that the clinical experience of specialized physicians was peculiarly important in judging this drug's effectiveness because herpes zoster is difficult to diagnose, runs a variable course in patients, and produces a symptom—pain—which is highly subjective and thus resistant to objective means of detection and measurement.

(2) In letters responding to a written request by Cooper for information, 15 practicing doctors declared their belief that Protamide is more effective than any other regimen in treating herpes zoster and related ailments.

(3) Cooper also introduced nine clinical studies, printed in various medical journals, on Protamide's efficacy in treating herpes zoster and related illnesses. Eight of the studies, published between 1947 and 1960, concluded that the drug provided beneficial treatment; the ninth study, published in 1968, concluded that Protamide had no effect on herpes zoster.

There ensued, in the FDA's language, "an extensive exchange of letters and

---

drugs left the market before 1962. For one drug with an NDA, however, there were often many chemically identical or similar "me-too" drugs marketed without NDAs. *See Hynson, supra* note 4, 412 U.S. at 621, 93 S.Ct. 2469.

9. 31 Fed.Reg. 9426 (July 9, 1966).

10. Appendix filed with this court Dec. 11, 1972, at 19–23. While none of the panels explained its conclusions in detail, each cited one or more published studies which had been consulted, and each noted that additional "controlled" or "documented" studies were needed to establish the drug's efficacy. Expert panels generally had the option of choosing among five ratings: effective, effective but, probably effective, possibly effective, and ineffective. FDA review has begun with drugs rated "ineffective" and

proceeded up the scale of ratings. 35 Fed. Reg. 11273 (July 14, 1970). *See also* 37 Fed.Reg. 26623 (Dec. 14, 1973).

11. Cooper's subsequent attempts to demonstrate Protamide's efficacy dealt not merely with ophthalmic herpes zoster but also with the ailments concerning which the FDA had required labeling deletions. The record does not reveal whether Cooper effected such deletions after the FDA announcement of March 27, 1969. We have assumed throughout that Cooper wished to establish Protamide's effectiveness for herpes zoster as well as for ophthalmic herpes zoster. The FDA does not contend that an NAS–NRC rating of "ineffective" forecloses a drug manufacturer from attempting to establish the drug's efficacy.

numerous conferences" between Cooper and the Administration to explore "methods of establishing the effectiveness of Protamide."[12] Two years of such discussions did not result in supplementation of Cooper's evidentiary submission. On August 25, 1972, pursuant to an analysis of this submission, the FDA simultaneously denied Cooper's request for a hearing and withdrew approval from the NDA for Protamide, explaining in an item-by-item critique of Cooper's evidence that none of the materials indicating efficacy constituted "adequate and well-controlled investigations" as required by 21 U.S.C. § 355(d)

and (e) and defined by 21 C.F.R. § 130.-12(a)(5).[13]

## II. THE IMPACT OF *Hynson*

After this appeal was filed, the Supreme Court decided Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973), which, as both parties concede, governs the instant case. In *Hynson*, as here, the FDA had withdrawn approval from an outstanding NDA without a hearing on a finding that the applicant's evidence of efficacy did not consist of "adequate and well-controlled investigations." The Court affirmed the Fourth

12. Final Order, *supra* note 5, 37 Fed.Reg. at 17228. While this interchange of views is not in the record, and is consequently not a proper factor in our decision, we recount here Cooper's version of the interchange, which the FDA has not chosen to either accept or rebut. Brief for petitioner at 12–13.

The FDA had announced in July of 1970 that any company whose drug was found "possibly effective" for a particular ailment by the NAS–NRC study, as was Protamide for ophthalmic herpes zoster, would have six months from the date of the finding to supply new evidence justifying a summary change in the designation to "effective." 35 Fed.Reg. 11273 (July 14, 1970). This announcement preceded by three days the FDA's formal publication of notice to Cooper that withdrawal proceedings would be initiated for Protamide. In addition to answering this withdrawal notice by requesting a hearing and by submitting the evidence of efficacy here under review, Cooper also "began a series of meetings with FDA scientists in order to determine what sort of study should be done" during the six-month grace period pertinent to the efficacy claim relating to ophthalmic herpes zoster. Brief for petitioner at 12. Cooper contends that the parties finally agreed on a protocol for new research, "but so much time had been spent in this enterprise that it became apparent that the study could not be completed within the six-month time period." *Id.* Cooper does not state when the agreement on a protocol was reached or supply any details of the agreement. In Feb. 1971—near the close of Cooper's six-month grace period—the FDA established procedures whereby grace period extensions could be requested by an applicant planning or engaged in new research. 36 Fed.Reg. 3127 (Feb. 18, 1971). Six months too late, on August 16, 1971, Cooper invoked the new procedures to request

an extension. Brief for petitioner at 12. By this time, of course, Cooper had already enjoyed a 12-month grace period. Allegedly, the FDA did not formally reply to Cooper's request for further extension. *Id.* at 13. Instead, a further 12-month extension was granted *de facto*, for the order withdrawing Protamide from the market was not issued until Aug. 1972. *See* note 5 *supra*. In this order, the FDA of course dealt only with the evidence which Cooper had, by then, submitted for consideration. Cooper claims that, even now, "clinical studies are underway to demonstrate the efficacy of Protamide for ophthalmic herpes zoster, studies being performed in accord with FDA regulations and procedures[.]" Brief for petitioner at 13.

If Cooper's account is accurate, the FDA deserves rebuke for failing to reply formally to Cooper's Aug. 16, 1971 request for an extension of the grace period. But a 12-month extension was granted *de facto*, and we find nothing in the FDA regulations requiring even this. Certainly the Administration was justified in acting on the information before it *two full years* after affording formal notice of withdrawal proceedings. The 1962 legislation contemplated that withdrawals would commence two years after the Act's effective date. Drug Amendments of 1962, § 107(c)(2) & (c)(3)(B), 76 Stat. 788, note following 21 U.S.C. § 321.

The withdrawal order deals only with commercial marketing of the drug and does not preclude new or continued research on Protamide's effectiveness. *See* note 47 *infra* and accompanying text.

13. The FDA construed as "well-controlled" the single study which found Protamide to be ineffective in treating herpes zoster, that by Boundy and Bamford. Final Order, *supra* note 5, 37 Fed.Reg. at 17228. *See* note 27 *infra*.

Circuit's conclusion that Hynson's particular evidentiary submission was sufficient to require a hearing, but the opinion also set out three general principles which went beyond the facts of the case and are thus pertinent to this appeal.[14]

(1) The Court upheld the validity of the FDA's regulatory criteria for "adequate and well-controlled investigations," 21 C.F.R. § 130.12(a)(5).

> ■t is not disputed here that they express well-established principles of scientific investigation. Moreover, their strict and demanding standards, barring anecdotal evidence indicating that doctors "believe" in the efficacy of a drug, is amply justified by the legislative history. The hearings underlying the 1962 Act showed a marked concern that impressions or beliefs of physicians, no matter how fervently held, are treacherous.

412 U.S. at 618–619, 93 S.Ct. at 2777.

(2) The Court upheld the validity of the FDA's regulations allowing summary withdrawal of approval from NDA s, 21 C.F.R. § 130.14(b) (April 1, 1973). Summary action was deemed proper

> where it is apparent at the threshold that the applicant has not tendered *any* evidence which *on its face* meets the statutory standards as particularized by the regulations.
>
> * * * * * *
>
> There can be no question that to prevail at a hearing an applicant must furnish evidence stemming from "adequate and well-controlled investigations." We cannot impute to Congress the design of requiring, nor does due process demand, a hearing when it appears conclusively from the applicant's "pleadings" that it cannot succeed.

14. One post-*Hynson* case has suggested that an applicant's right to a hearing should be determined by comparing its evidentiary submission with that submitted by Hynson. E. R. Squibb & Sons, Inc. v. Weinberger, 3 Cir., 483 F.2d 1382 (1973). Because evidentiary submissions are invariably voluminous and highly technical, such comparisons would be time-consuming and very difficult. In

412 U.S. at 620–621, 93 S.Ct. at 2478. (Emphasis in original.) A footnote qualified this statement to apply "only to those regulations that are precise" and indicated that "it might not be proper to deny a hearing [on] the grounds that [a] study did not comply" with regulatory standards which "do not lend themselves to clear-cut definition." 412 U.S. at 621 n. 17, 93 S.Ct. at 2479.

(3) Courts of Appeals were instructed, in reviewing a hearing denial, to

> determine whether the Commissioner's findings accurately reflect the study in question and if they do, whether the deficiencies he finds conclusively render the study inadequate or uncontrolled in light of the pertinent regulations.

412 U.S. at 622, 93 S.Ct. at 2479.

With these parameters in mind, we move directly to consider Cooper's claims that its evidentiary submission was sufficient to require a hearing.

## III. COOPER'S CLAIMS FOR A HEARING

Cooper argues that its evidence raised two broad issues of fact which the FDA could not lawfully resolve in summary fashion. First, Cooper contends that its five doctors' affidavits concerning the nature of herpes zoster raise the "factual" question whether Protamide's efficacy can fairly be determined by the "objective" methods prescribed in the FDA regulations defining controlled investigations. Second, Cooper asserts that a factual dispute exists as to whether those regulatory criteria are met by the published clinical studies submitted to the FDA.

*Hynson* neither the Supreme Court nor the Fourth Circuit described the evidentiary submission in question in great detail, and the record of the case is not easily available. We think it clear that the Supreme Court in *Hynson* intended to establish general rules which Courts of Appeals could apply in each case.

## A. *Affidavits on the Nature of Herpes Zoster*

■ The affidavits state that herpes zoster is hard to diagnose, runs a variable course, and causes pain—a symptom difficult to measure objectively. From these undisputed premises, Cooper concludes that a factual question exists whether the testimonials of experienced physicians, rather than the controlled studies required by regulation, should be recognized as substantial evidence of Protamide's efficacy. We do not think this is an issue requiring a hearing.

The regulations are subject to waiver upon a properly detailed showing of how and why they are inappropriate for a particular disease or drug.[15] Cooper has never petitioned for such a waiver. Presumably, Cooper is inviting us to consider its evidentiary submission to the Administration as a *de facto* waiver petition and to construe the final order under review as a formal rejection of the petition. With some reluctance, we accept the invitation in this case, for the FDA has established no particular procedures for filing waiver petitions. We note, however, that orderly review would be facilitated by promulgation of, and adherence to, such procedures.

■ Cooper's submission does not, as the waiver regulation requires, "set forth clearly and concisely the specific provision or provisions" in the regulations which are assertedly inapplicable to Protamide research, nor does the submission specify or defend "alternative procedures" which should be used to test the drug's efficacy.[16] Rather, Cooper contends broadly that efficacy should be assessed through the experience and testimonials of doctors who have treated herpes zoster, rather than through "controlled" investigation. This constitutes a request to waive not merely the Administration's regulations but also the fundamental requirement of the 1962 legislation. Granting such a waiver is beyond the power of either the FDA or the courts.

The 1962 amendments clearly demand that efficacy be shown by controlled tests—that is, by studies where some diseased persons receive the drug in question while other diseased persons, otherwise comparable, receive nothing, or a "placebo," or some substance of known effect.

The "substantial evidence" requirement reflects the conclusion of Congress, based upon hearings, that clinical impressions of practicing physicians and poorly controlled experiments do not constitute an adequate basis for establishing efficacy.[17]

---

15. It is stated in 21 C.F.R. § 130.12(a)(5) (ii)(a):

> *Provided, however,* That any of the above criteria may be waive[d] in whole or in part, either prior to the investigation or in the evaluation of a completed study, by the Director of the Bureau of Drugs with respect to a specific clinical investigation; a petition for such a waiver may be filed by any person who would be adversely affected by the application of the criteria to a particular clinical investigation; the petition should show that some or all of the criteria are not reasonably applicable to the investigation and that alternative procedures can be, or have been, followed, the results of which will or have yielded data that can and should be accepted as substantial evidence of the drug's effectiveness. A petition for a waiver shall set forth clearly and concisely the specific provision or provisions in the criteria from which waiver is sought, why the criteria are not reasonably applicable to the particular clinical investigation, what alternative procedures, if any, are to be, or have been, employed, what results have been obtained, and the basis on which it can be, or has been, concluded that the clinical investigation will or has yielded substantial evidence of effectiveness, notwithstanding nonconformance with the criteria for which waiver is requested.

16. *Id.*

17. *Hynson, supra* note 4, 412 U.S. at 630, 93 S.Ct. at 2481. (Footnote omitted.) The Court also stated:

> The hearings underlying the 1962 Act show a marked concern that impressions or beliefs of physicians, no matter how fervently held, are treacherous.

*Id.* at 619, 93 S.Ct. at 2478, *citing* Hearings on S. 1552 before the Subcommittee on Anti-

Properly implementing the legislative intent, FDA regulations state:

> Uncontrolled studies or partially controlled studies are not acceptable as the sole basis for the approval of claims of effectiveness. * * * Isolated case reports, random experience, and reports lacking the details which permit scientific evaluation will not be considered.

■ Cooper argues that controlled tests are impossible because of the nature of herpes zoster and of the symptom—pain—which Protamide aims to alleviate and which only experienced doctors can appraise. We do not perceive the logic of this argument. That accurate diagnosis of a disease requires the talents of experienced doctors does not preclude the use of controlled tests, but only entails that these tests should be conducted or supervised by experienced doctors. The 1962 legislation itself provides that the necessary controlled studies shall be made "by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved." 21 U.S.C. § 355(d). That pain is difficult, or even impossible, to measure quantitatively does not entail the infeasibility of controlled tests; rather this consideration would seem to call for unusually careful procedures of control and observation so as to cross-check or normalize the observations of those administering the drug.[18] The regulations nowhere require that a drug's efficacy be either measurable on instruments or ascertainable without communication between the experimenter and the subject. There is nothing in the pertinent legislative history to suggest that Congress intended the FDA to adjudicate the virtues of controlled investigation—a central tenet of the scientific method, expressly incorporated in the legislation—every time the effectiveness of a pain-relieving drug was put in question. That pain is involved does not constitute grounds for waiver of the FDA's regulations.

Finally, we note that none of Cooper's affidavits or testimonial letters suggests the impossibility of investigating Protamide's efficacy in a controlled manner. In fact, the only two doctors who addressed the question conceded that a controlled study could be undertaken.[19] Even Cooper's counsel admits the feasibility of such a study—claiming that Cooper itself has one "underway."[20]

## B. *The Medical Studies as Controlled Investigations*

■ There remains the question whether Cooper's evidentiary submission does in fact comply with the FDA's regulations. By the teaching of *Hynson,*

---

trust and Monopoly of the Senate Committee on the Judiciary, 87th Cong., 1st Sess., pt. 1, pp. 195, 282, 411–412. The various acceptable types of control are set out at 21 C.F.R. § 130.12(a)(5)(ii)(a)(4).

18. The regulations require "steps * * * to minimize bias on the part of the subject and observer" and "methods * * * to minimize bias on the part of the observers and the analysts of the data." 21 C.F.R. § 130.12(a)(5)(ii)(a)(3) & (4).

19. Dr. Paul E. Foldes stated: "I believe that it is possible to conduct a study to show the efficacy of Protamide and I would like to see such a study done. I do not believe that it is necessary to remove Protamide from the market while such a study is being conducted." Dr. William H. Kessler stated: "[I]t is my opinion that it would be virtually impossible to design a controlled study of the effectiveness * * * which could be completed *in any reasonable period of time.*" Appendix, *supra* note 10, at 79 & 83. (Emphasis added.)

20. *See* note 12 *supra.* As indicated there, Cooper has not exactly rushed to supply new and adequate support for Protamide's labeling claims. When the instant order was issued, ten years after the 1962 Amendments, the latest medical study available to the Administration purporting to show Protamide's efficacy was dated 1960. Baker, Use of Protamide in the Treatment of Herpes Zoster, 63 Pa.Med.J. 697–698 (May 1960), reprinted in Appendix, *supra* note 10, at 126–127. Cooper attempts to justify its reliance on stale and inadequate evidence by claiming, on the one hand, that better studies can't be done, and on the other hand that it has not had sufficient time to do them. These claims contradict each other; we find merit in neither.

we must affirm the Administration's summary finding of non-compliance if we determine that the final order's characterization of each piece of evidence accurately identifies defects which "conclusively render the study inadequate or uncontrolled in light of the pertinent regulations." *Hynson, supra,* 412 U.S. at 622, 93 S.Ct. at 2479. In addition, *Hynson* states in a footnote that such a determination "might not be proper" when the regulations invoked are not "precise." *Id.* at 621 n. 17, 93 S.Ct. 2469.

Cooper argues that very few of the regulations are in fact "precise" and thus that hearing denials are rarely proper. This is not the thrust of *Hynson.* The Court there broadly approved the FDA's summary procedures and expressly liberated them from the technical limitations which the Seventh Amendment makes necessary with respect to summary judgment procedures in civil litigation.[21] The Court found that the controls regulations correctly reflect Congress' intent, competently express the canons of scientific investigation, and adequately notify drug manufacturers "of the evidence they must present to sustain their NDA's."[22] With a few exceptions, *Hynson* did not indicate which regulatory provisions are "precise" and which are not.[23] An exhaustive classification along these lines

is surely impractical. Like most, these regulations enjoy varying degrees of precision, and even to rank them according to their relative precision would be difficult in the abstract. The Court did not say that FDA reliance on a less than "precise" regulatory provision is necessarily improper, but only that it "might" be so.[24] This choice of language, we think, recognizes that the precision of a regulation will vary with the context in which it is invoked. Even a relatively precise regulation may create a small zone of ambiguity, and a particular piece of evidence submitted by an applicant may fall into that zone. By the same token, a regulatory provision which seems vague in the abstract may nonetheless be conclusively at odds with a peculiarly deficient item of evidence.

No simple verbal formula can much lighten the tasks of judicial review in cases such as this. The court must see that the FDA does not shut itself off from relevant facts; at the same time, as *Hynson* teaches, the court must vindicate the general public's right to an efficient administration of the congressional mandate:

> The NAS–NRC panels evaluated approximately 16,500 claims made on behalf of the 4,000 drugs marketed pursuant to effective NDA's in 1962. Seventy percent of these claims were found not to be supported by substan-

---

21. *Hynson, supra* note 4, 412 U.S. at 621–622, 93 S.Ct. 2469.

22. *Id.* at 619 & 622, 93 S.Ct. at 2479. Prior to the Supreme Court's decision in *Hynson,* a panel of this court addressed the FDA's summary procedures in the context of drug efficacy. USV Pharmaceutical Corp. v. Secretary of HEW, 151 U.S.App.D.C. 284, 466 F.2d 455 (1972). Analogizing those procedures to summary judgment in judicial proceedings, the court stated that "it was incumbent upon the Commissioner, before calling upon the petitioner for additional evidence establishing a right to a hearing, *to state facts and reasons* showing at least prima facie that the evidence before him raised no material issue of fact which would justify a hearing." 151 U.S.App.D.C. at 290, 466 F.2d at 461. (Emphasis added.) While *Hynson* did not mention *USV,* it plainly held

that the FDA's regulations defining "adequate and well-controlled investigations," 21 C.F.R. § 130.12(a)(5), themselves constitute sufficient "facts and reasons" to require that an applicant seeking a hearing produce its own evidence of efficacy.

23. *Hynson* characterized as "precise" the regulation requiring "[a] summary of the methods of analysis and an evaluation of data derived from the study, including any appropriate statistical methods." 21 C.F.R. § 130.12(a)(5)(ii)(a)(5). The Court termed not "clear cut" the regulation requiring a method of selecting patients that "provide adequate assurance that they are suitable for the purposes of the study." 21 C.F.R. § 130.-12(a)(5)(ii)(a)(2)(i). 412 U.S. at 621 n. 17, 93 S.Ct. at 2479.

24. *Id.*

tial evidence of effectiveness, and only 434 drugs were found effective for all their claimed uses. If FDA were required automatically to hold a hearing for each product whose efficacy was questioned by the NAS–NRC study, even though many hearings would be an exercise in futility, we have no doubt that it could not fulfill its statutory mandate to remove from the market all those drugs which do not meet the effectiveness requirements of the Act.

*Hynson, supra,* 412 U.S. at 621, 93 S.Ct. at 2479.

\* \* \* This is an age of ever-expanding dockets at the administrative as well as at the judicial level. If the administrative controls over drugs are to be efficient, they must be exercised with dispatch. \* \* \*

*Id.* at 626, 93 S.Ct. at 2481.

■ After a searching examination of Cooper's evidentiary submission, of the FDA's characterizations of it, and of the regulatory provisions invoked in those characterizations, we are convinced that the Administration has located for each item of evidence at least one deficiency (and usually many such) which conclusively disqualifies the item "in light of the pertinent regulations." *Id.* at 622, 93 S.Ct. at 2479. As noted below,[25] the Administration could well, and should, have drafted a more detailed and informative order. But the document's purport is everywhere plain. The case with which it deals is not, we think, a close one.

As Cooper does not claim that its affidavits and testimonial letters constitute "adequate and well-controlled investigations," our inquiry focuses on the nine medical studies. These fall into three groups: the unfavorable, the uncontrolled, and the poorly controlled.

■ 1. *The unfavorable study:* The only submitted research done on Protamide treatment of herpes zoster since the 1962 legislation is the Australian study by Boundy and Bamford, published in 1968.[26] This finds Protamide to be completely ineffective. The study is by far the most elaborate and sophisticated of those submitted by Cooper, and the FDA designated it "well-controlled." [27] Cooper attacks this finding, but we need not explore the dispute to a conclusion. We must of course hold the Administration to whatever regulatory interpretations are stated in or implied by its favorable verdict on the Boundy study. But the correctness of that verdict is not a prerequisite to summary rejection of Cooper's application. *Hynson* authorizes summary disposition where the NDA applicant fails to produce adequate and well-controlled studies showing efficacy. There is no burden on the FDA to produce adequate and well-controlled studies showing inefficacy.

2. *The uncontrolled studies:* The FDA characterized six of the remaining eight studies as being entirely uncontrolled.[28] Cooper nowhere attempts to meet this fundamental allegation. An examination of the six studies

25. *See* Part IV *infra.*

26. Boundy & Bamford, Treatment of Herpes Zoster with "Protamide", Med.J. of Australia 528–531 (March 1968), reprinted in Appendix, *supra* note 10, at 130–133.

27. Final Order, *supra* note 5, 37 Fed.Reg. at 17229.

28. Final Order, *supra* note 5, 37 Fed.Reg. at 17228–17229. The studies in question are: Xander, The Problem of Post Herpetic Neuralgia, 1 Western Medicine 14–15 (Sept. 1960), reprinted in Appendix, *supra* note 10, at 128–129; Sforzolini, The Treatment of Ophthalmic Herpes Zoster with Protamide,

62 AMA Archives of Ophthalmology 381–385 (Sept. 1959), Appendix at 106–110; Lehrer, Lehrer & Lehrer, Clinical Evaluation of Protamide in Sensory Nerve Root Inflammations and Allied Conditions, Northwest Medicine 1249–1252 (Nov. 1955), Appendix at 119–122; Smith, Treatment of Neuritis with Protamide, New York Medicine 16–19 (Aug. 1952), Appendix at 115–118; Marsh, Treatment of Herpes Zoster with Protamide, 1 US Armed Forces Med.J. 1045–1047 (Sept. 1950), Appendix at 123–125; Costello, A New Treatment for the "Lightning Pains" of Tabes Dorsalis, 51 Urologic & Cutaneous Rev. 260–263 (1947), Appendix at 102–105.

has persuaded us that the allegation is correct in each instance.[29] By the regulations, a study must have some kind of controls if it is to consutute more than merely corroborative support for a claim of effectiveness. 21 C.F.R. § 130.12(a)(5)(ii)(c).

■ 3. *The poorly controlled studies*: The two remaining studies employed what a layman might consider "controls." The issue is whether the studies were "well-controlled" as that term is defined by pertinent FDA regulatory provisions.

*The Combs study (1952)* [30]: Here 50 patients with herpes zoster were treated with Protamide while six received a "placebo" of saline solution. In the margin we quote the FDA's critique of the study, adding bracketed citations to those regulatory provisions plainly invoked by the critique.[31] We find no fault with the critique's accuracy, and several of the cited deficiencies are sufficient to support the FDA's summary rejection of the study.

The FDA charges that

there was no method of selecting patients utilized to insure that subjects were suitable for purposes of the study [21 C.F.R. § 130.12(a)(5)(ii) (a)(2)(i)], subjects were not assigned in such a way as to minimize bias [21 C.F.R. § 130.12(a)(5)(ii)(a)(2) (ii)], and comparability of pertinent variables in test and control groups was not assured [21 C.F.R. § 130.12 (a)(5)(ii)(a)(2)(iii)].[32]

29. There is no mention of controls in the Xander, Sforzolini and Lehrer studies. Smith uses the word "control," but he means by it only that Protamide was tested against two diseases, not that Protamide was tested against an appropriate control substance as required by regulation. 21 C. F.R. § 130.12(a)(5)(ii)(a)(4). Costello's study is of questionable relevance for it does not deal with herpes zoster and ophthalmic herpes zoster, treatment of which is, according to Cooper, the "principal intended purpose" of Protamide. Brief for petitioner at 5. Further, Costello's study does not identify a control group or employ a control substance meeting the regulatory requirements. Smith and Marsh employed no controls on the theory that it was commonly known that other regimens were totally ineffective in treating herpes zoster. FDA regulations do permit use of such an "historical" control, 21 C.F.R. § 130.12(a)(5)(ii)(a)(4)(iv), but only for "diseases with high and predictable mortality * * *, with signs and symptoms of predictable duration or severity * * *, or in case of prophylaxis, where morbidity is predictable." As the FDA order pointed out, herpes zoster does not meet these criteria, and the Marsh study does not, as the regulation above requires, present a "documented natural history of the disease or condition in comparable patients or populations with no treatment or with a regimen * * * the effectiveness of which is established." *See* 37 Fed.Reg. at 17229.

30. Combs & Canizares, Herpes Zoster: Its Treatment with Protamide, N.Y. State J. of Med. 706–708 (March 15, 1952), discussed in Final Order, *supra* note 5, 37 Fed.Reg. at 17228, and reprinted in Appendix, *supra* note 10, at 112–114.

31. * * * This study is not an adequate and well-controlled study, even though it included six patients who were given saline placebos to which they failed to respond, since, among other reasons, there was no method of selecting patients utilized to insure that subjects were suitable for purposes of the study [21 C.F.R. § 130.12(a)(5)(ii)(a)(2)(i)], subjects were not assigned in such a way as to minimize bias [21 C.F.R. § 130.12(a)(5)(ii)(a)(2) (ii)], and comparability of pertinent variables in test and control groups was not assured [21 C.F.R. § 130.12(a)(5)(ii)(a)(2) (iii)]. Ten of the 50 patients had herpes zoster frontalis (which is not the ophthalmic herpes zoster for which Protamide is recommended) in whom the eyes were affected in one way or another. The regimen used varied from an injunction every 6 hours to one injection every 2 or 3 days, for a total of one to 16 injections over a period of 2 to 25 days. However, there was no correlation between the number of injections and days of treatments [21 C.F.R. § 130.12(a) (5)(ii)(b)].

Furthermore, there was neither an explanation of the method of observation and recording of results [21 C.F.R. § 130.12(a)(5)(ii)(a)(3)], nor a comparison of the results of treatment or diagnosis with a control in such a fashion as to permit a quantitative evaluation [21 C.F. R. § 130.12(a)(5)(ii)(a)(4)]. Finally, there was no summary of the methods of analysis and evaluation of data derived from the study, including statistical methods [21 C.F.R. § 130.12(a)(5)(ii)(a)(5)]. Final Order, *supra* note 5, 37 Fed.Reg. at 17228–17229.

32. *Id.*

The regulations invoked by this criticism use terms the precision of which may fairly be debated in the abstract: insure, suitable, minimize, bias, comparability, etc. But we are not deciding in the abstract. These criticisms have conclusive force in the context of the Combs study. This study treats of its control group in one sentence:

> Six "control" patients were given physiologic saline injections without any benefit.[33]

Thus the study unveils *no* method of selecting these patients, shows *no* attempt to control for any pertinent variables between the test and control groups, and describes *no* procedure for minimizing bias in the assignment of patients between the test and control groups.

The FDA further charges, and accurately, that within the Protamide test group

> there was no correlation between the number of injections and days of treatment.[34]

The regulations quite understandably require drugs dosages to be "standardized" so as "to give significance to the results of the investigation." 21 C.F.R. § 130.12(a)(5)(ii)(*b*). While the quoted criticism does not refer in terms to this regulatory provision, the logical connection is self-evident. Furthermore, both the variations in dosage and the cryptic description of the control group provide firm support for the FDA's observation that the study contained no

> comparison of the results of treatment of diagnosis with a control in such a fashion as to permit a quantitative evaluation [21 C.F.R. § 130.12(a)(5)(ii)(*a*)(*4*)]

and utilized no "statistical methods" [21 C.F.R. § 130.12(a)(5)(ii)(*a*)(*5*)].[35] As noted, these observations make plain reference to the language of particular regulatory provisions. Given that a single regulatory deficiency would be sufficient to disqualify the study, the FDA's summary rejection is abundantly justified.

*The Baker study* [36]: Here 34 patients with herpes zoster were treated with Protamide and 10 with injections of Vitamin B$_{12}$. (There were no cases of ophthalmic herpes zoster, the only ailment for which the drug was judged "possibly effective" by the NAS–NRC investigation.) The FDA's characterization of the study [37] expresses or plainly implies several criticisms. By the placing of quotation marks, the order implies disapproval of Vitamin B$_{12}$ as a control substance; the Administration charges that the study report provides "no raw data * * * upon which a comparison of the test and control groups can be made"; and the order asserts that the "size of the control group" is "statistically inadequate." [38]

To the last criticism, we cannot accord dispositive weight. While questions of statistical adequacy do seem peculiarly appropriate for summary disposition, the regulations as presently drafted provide no guidelines as to minimal sample size. As for the other two criticisms, each is presented in an overly cursory fashion. Nonetheless, however artlessly, the order does succeed here in identifying deficiencies which conclusively disqualify the Baker study "in light of the pertinent regulations."

The FDA should have expressed its disapproval of Vitamin B$_{12}$ in a straight-

33. Combs & Canizares, *supra* note 30, Appendix at 112.

34. *See* note 31 *supra*.

35. *Id.*

36. *See* note 20 *supra*.

37. Thirty-four patients with herpes zoster were treated with Protamide while 10 "control" patients with herpes zoster were treated with Vitamin B$_{12}$ [21 C.F.R. § 130.12(a)(5)(ii)(*a*)(*4*)(*ii*) & (*iii*)]. * * *

This study is not well controlled since the size of the control group is statistically inadequate [21 C.F.R. § 130.12(a)(5)(ii)(*a*)(*5*)] and there is no raw data provided upon which a comparison of the test and control groups can be made [21 C.F.R. § 130.12(a)(5)(ii)(*a*)(*2*)]. No cases of ophthalmic herpes zoster were reported. Final Order, *supra* note 5, 37 Fed.Reg. at 17229 (bracketed material added).

38. *Id.*

forward manner, rather than relying on the disparaging implication of the quotation marks placed around the word "control." But the implication, urged by the Administration's counsel, does seem a fair one to us, and we perceive no merit in remanding this drawn-out controversy so that the Administration may convert a plain implication into a formal sentence. That Vitamin $B_{12}$ fails to comply with the regulations is clear. Baker used the substance on the theory that it might have an effect on herpes zoster, a theory supported by the vitamin's usefulness in treating related ailments.[39] The pertinent regulations provide that a control substance be either "an inactive preparation designed to resemble the test drug as far as possible," 21 C.F.R. § 130.12(a)(5)(ii)(a)(4)(ii), or "[a]n effective regiment [sic] of therapy," 21 C.F.R. § 130.12(a)(5)(ii)(a)(4)(iii). We see nothing ambiguous or esoteric in these provisions. They incorporate the elementary scientific principle that a test of two possibly effective agents constitutes two uncontrolled tests, not a single test with two controls. From his experiment on ten subjects, Baker concluded that Vitamin $B_{12}$ is ineffective against herpes zoster. But this limited experience hardly renders the substance a known "inactive preparation," and there is no evidence presented that the vitamin is an "effective regimen."

In charging that the Baker study provides "no raw data * * * upon which a comparison of the test and control groups can be made," the FDA is not closely paraphrasing any one provision of the regulations. Accordingly, to facilitate judicial review the order should have expressly drawn the connection between the criticism and the pertinent provisions. But, again, a remand for this purpose would exalt form over substance in the context of this case. For the quoted criticism quite obviously invokes the set of regulatory provisions dealing with the make-up and comparability of test and control groups.[40] These provisions do not require that the report of a medical study contain all of the study's "raw data," but neither does the FDA's criticism suggest such a *per se* requirement. If the report describes the systematic attention given to proper selection and assignment of test and control groups, and to proper treatment of pertinent variables, the listing of raw data would serve merely to corroborate the accuracy of the report's description; the regulations do not seem to require the report to contain such corroboration. But if such a description of procedures and precautions is lacking or deficient in the report, logic suggests that only the raw data of the study could show the study's compliance with regulatory standards. If, under these circumstances, the raw data is omitted, the report fails to meet the regulatory requirements.[41]

39. Baker, *supra* note 20, Appendix at 126.

40. The regulations, at 21 C.F.R. § 130.12(a)(5)(ii)(a), state:

The plan or protocol for the study and the report of the results of the effectiveness study must include the following:

\* \* \* \* \*

(2) A method of selection of the subjects that—

(i) Provides adequate assurance that they are suitable for the purposes of the study, diagnostic criteria of the condition to be treated or diagnosed, confirmatory laboratory tests where appropriate, and, in the case of prophylactic agents, evidence of susceptibility and exposure to the condition against which prophylaxis is desired.

(ii) Assigns the subjects to test groups in such a way as to minimize bias.

(iii) Assures comparability in test and control groups of pertinent variables, such as age, sex, severity, or duration of disease, and use of drugs other than the test drug.

41. The FDA approved the Boundy study, *supra* note 26, as "well-controlled," despite the fact that the Boundy report, like the Baker report, contained no raw data on each individual patient used in the test and control groups. But as is indicated in notes 43–44 & 46 *infra*, the Boundy report itself demonstrated that systematic attention was given to selection, assignment, and variable-control of the patients. Such was not the case with the Baker report. Thus there is nothing inconsistent or contradictory about the FDA's divergent attitudes toward the two reports.

The relevant portion of the Baker report states:

> Thirty adults, 45 to 82 years old, and four children, 7 to 12 years old, were treated with Protamide for herpes zoster. Ten adult patients in the same age group were treated with cyanocobalamine (vitamin B[12]).
>
> * * *
>
> * * * * * *
>
> In each case therapy was started as soon as possible after the onset of herpes zoster * * *. * * *[42]

We think the FDA was fully justified in thinking this brief discussion inadequate to establish Baker's conformance to the pertinent regulations. As for suitability of the subjects used, the report does not reveal how or whether diagnosis of the disease or of its stage of progress was cross-checked or otherwise normalized.[43] The report fails entirely to reveal procedures, if such there were, for "assign-[ing] the subjects to test groups in such a way as to minimize bias."[44] Finally, even for purposes of summary disposition we do not think the Administration must accept as "assur[ance] [of] comparability in test and control groups of pertinent variables"[45] the Baker report's comment that control patients were "in the same age group" as some of the test patients. The "age group" in question stretches from 45 to 82 years, and no variables other than age are mentioned.[46]

Given that a single regulatory deficiency would suffice to disqualify this study, we have no trouble affirming the Administration's rejection of it.

We conclude that Cooper "has not tendered *any* evidence which *on its face* meets the statutory standards as particularized by the regulations." *Hynson, supra*, 412 U.S. at 620, 93 S.Ct. at 2478. (Emphasis in original.) A hearing in this case "would be an exercise in futility," *id.* at 621, 93 S.Ct. at 2479, for

> [n]o amount of examination and cross-examination can change the scientific studies and the data reported into something they are not.

*Upjohn Co. v. Finch*, 6 Cir., 422 F.2d 944, 955 (1970). Cooper has never indicated, either to us or to the FDA, exactly what a hearing would accomplish in this case. It is always conceivable, of course, that there exists information about the submitted studies which Cooper failed to include in its submission. But, for two reasons, this speculative possibility does not entitle Cooper to a hearing. First, the FDA's regulations

---

42. Baker, *supra* note 20, Appendix at 127.

43. By contrast, the Boundy study contained a cross-check on diagnosis:

> The patients to be accepted were those attending the surgeries of the general practitioners collaborating in the trial for whom there was not the slightest doubt of the diagnosis of herpes zoster, and who would normally be treated for the relief of pain. Provision was made for the referral of patients under treatment if, for any reason, doubts developed as to the diagnosis.

Boundy & Bamford, *supra* note 26, Appendix at 130. Furthermore, the Boundy study carefully assessed the initial pain level of test and control subjects, *id.* at 132, Table 6, and distinguished cases of postherpetic pain, *id.* at 132, Table 4, thereby showing systematic attention to the stage of progress of the disease.

44. By contrast, the Boundy study took elaborate precautions so that neither patients nor observing doctors would know which patients had received Protamide and which the placebo. Boundy & Bamford, *supra* note 26, Appendix at 131.

45. 21 C.F.R. § 130.12(a) (5) (ii) (*a*) (*2*) (*iii*).

46. By contrast, the Boundy study expressly and carefully controlled for the age factor by dividing the test and control populations into five age brackets under 20, 20–39, 40–59, 60–79, and 80 and over) and determining that the test and control groups were not *statistically biased as to any age bracket.* Boundy & Bamford, *supra* note 26, Appendix at 131, Table 2. Furthermore, statistical tests were run to control for the effects of initial pain level, *id.* at 132, Table 6, for the cross-effects of initial pain level and age, *id.* at 132, Table 7, and for differences between herpetic and postherpetic pain, *id.* at 132, Table 4.

clearly provide that "the report of the results" of a study must itself demonstrate the study's compliance with the regulations. 21 C.F.R. § 130.12(a)(5)(ii)(a). If evidence *dehors* the report is crucial to showing the study's compliance with regulations, the applicant should at the very least advert to the evidence when submitting its application. Second, Cooper has never, at any stage in these proceedings, suggested what, if any, outside information exists on these studies. The reports submitted were merely clipped from old medical journals; they dealt with studies completed between 13 and 26 years ago. Scientists customarily publish their experiments in such a form that colleagues can ascertain from the published report itself whether minimally acceptable methods of control, observation, and analysis were employed. Absent specific contrary indications, the FDA is justified in assuming conformance with this custom.

█ We do not suggest that the Combs and Baker studies—or, indeed, the other studies, letters, and affidavits submitted by Cooper—are entirely without probative value in demonstrating Protamide's efficacy. Some or all of these items "may provide corroborative support" for the efficacy claim, 21 C.F.R. § 130.12(a)(5)(ii)(*c*). The instant order merely declares, and properly so,

that these studies do not, separately or collectively, constitute the "substantial evidence" required by statute, 21 U.S.C. § 355(e)(3). That an item is not substantial evidence does not preclude its reintroduction in future NDA applications. If, in a new application, Cooper supplements the materials submitted here with a new study which does not conclusively fail the regulatory standards, the *entire package* will require consideration in a hearing.

While the FDA's order removed Protamide from the commercial market, the drug is apparently eligible for an investigational exemption.[47] If Cooper is genuinely serious about testing this drug in a proper fashion, that route to progress remains fully open. But we do not perceive how the new research, or proper administrative assessment of it, would be advanced by holding a hearing at this point on old and clearly inadequate medical studies.

### IV. A *Caveat*

While we sustain the FDA's action in this case, we are not pleased with the draftsmanship displayed in the instant order. Given the facts here, and given that the order does show full understanding of the applicable regulations and a conscientious examination of the submitted studies, we have been willing to take the plain meaning of the Admin-

---

47. The Food, Drug & Cosmetic Act authorizes exemption from the NDA requirements of "drugs intended solely for investigational use by experts qualified by scientific training and experience to investigate the safety and effectiveness of drugs." 21 U.S.C. § 355(i) (1970). The FDA has established procedures for granting such investigational exemptions. 21 C.F.R. § 130.3. The exemption may be denied if there is "convincing evidence that the drug is ineffective." 21 C.F.R. § 130.3(d)(4). The FDA has made no claim before us that this is the case with Protamide. The Final Order, *supra* note 5, states that Cooper

> has submitted to the FDA a notice of claimed investigational exemption for a new drug for a drug called Protamide which is different in composition from the Protamide subject to NDA 5–025 and this order.

37 Fed.Reg. at 12278. Cooper claims to be pursuing new research into efficacy of Protamide, presumably under an investigational exemption. *See* note 12 *supra*. Cooper denies the FDA's contention that the drug now under research differs materially from the "Protamide" which was the subject of the medical studies reviewed in the Final Order. Reply brief for petitioner at 7 n. 3. This question is not now ripe for either administrative or judicial consideration. The question will mature when and if Cooper submits its new research and requests that it be considered in conjunction with the medical studies already submitted. We doubt the FDA could decide the question adversely to Cooper without a hearing. It is a factual question, on which experts might divide, whether the "two" drugs are so different that evidence on one cannot be used to corroborate an efficacy claim as to the other.

istration's language. Where the order implied a proposition, we allowed the implication and proceeded to assess it. Where the order clearly invoked the substance of a regulatory provision, we did not demand chapter and verse citations. In future, however, we shall apply a stricter rule of construction to Administration orders associated with summary action.

 We shall expect the FDA to make its criticisms express and detailed, and to cite precisely to the pertinent regulations and evidentiary flaws. The regulations are extensive and technical; submitted evidence is typically abstruse and voluminous. Courts cannot efficiently shoulder their heavy burden of review under *Hynson* unless the Administration's orders make utterly transparent why each piece of submitted evidence fails the particular regulatory provisions relied upon. If a regulatory provision or a piece of evidence is fairly open to several interpretations, the Administration must explain and defend its chosen interpretation. On occasion, interpretational differences between the FDA and the applicant will, under the *Hynson* standard, be insoluble without a hearing or some other orderly procedure for exchanging views. The FDA cannot, however, escape such procedures by issuing a cursory order which obscures the differences.

Affirmed.

LEVENTHAL, Circuit Judge, dissenting:

This case gives the court its first opportunity to consider and apply the principles announced by the Supreme Court in Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973). Because I believe the majority has applied *Hynson* improperly and has misperceived the nature of the relationship between this court and the FDA, I respectfully dissent. I take this course reluctantly, being wary that the claim advanced by petitioners may reflect a legal tactic

more than a genuine controversy posed by a member of a regulated industry. However, I think the larger view of the public interest requires a ruling on the inadequacy of the FDA's approach. If petitioners have gained a litigating advantage, it will be only temporary, for if the FDA does its task correctly, it can proceed expeditiously and effectively in the public interest without undue sacrifice of interests of regulated companies.

I. GENERAL DISCUSSION OF ROLE OF COURTS ON FDA WITHDRAWAL OR APPROVAL OF NDA's

In the Drug Amendments of 1962, 76 Stat. 780, amending 21 U.S.C. § 301 et seq., Congress required the FDA to withdraw its approval of all ineffective prescription drugs. Because it required re-evaluation of the large number of approved drugs already in the market, the statute placed a heavy burden on the FDA. To discharge this burden, the agency has evolved certain innovative procedures, principal among which is the summary judgment technique validated in *Hynson*. That ruling is not to be applied grudgingly, for it is both sound in concept and necessary in practical administration. Yet *Hynson* imposes a limitation on FDA use of summary procedures: the agency must act on the basis of particularized regulations, and it cannot deny a hearing for failure to comply with qualitative regulatory standards that so lack clear-cut definition that it cannot be ascertained from the face of a study whether the standard has been met. *See* 412 U.S. at 620, 621 n. 17, 93 S.Ct. at 2479 n. 17. The significance of this limitation is apparent from the statutory and administrative context of the summary judgment procedure.

A. *Statutory Background.*

The Food and Drug Act requires "due notice and opportunity for hearing to the applicant" before FDA can withdraw approval of an existing New Drug

Application.[1] However, no evidentiary hearing need be held unless the manufacturer can demonstrate it would have a purpose. A hearing may be denied to an applicant who, having been given notice of a proposed withdrawal of and NDA for an allegedly ineffective drug, fails to present, in the words of the FDA regulation, a "well-organized and full factual analysis of the clinical and other investigational data he is prepared to prove in support of his opposition"— and his claim of effectiveness. *See Hynson*, 412 U.S. at 620, 93 S.Ct. at 2478.

The Supreme Court has predicated latitude in summary dispositions upon the FDA's having first issued clear-cut regulations that particularize the statutory standards. Regulations defining the content of "adequate and well-controlled studies" are necessary for the "due notice" to drug manufacturers of what the manufacturers must provide to demonstrate that there are matters requiring a hearing. Absent such "due notice" to inform the manufacturers' submissions, the agency cannot provide for "barring at the threshold those who neither measure up [to the statutory standards] nor show reasons why in the public interest the rule should be waived." *FPC v. Texaco*, 377 U.S. 33, 39, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964), quoted in *Hynson*, 412 U.S. at 620, 93 S.Ct. at 2478.

Even with particularized regulations, the FDA cannot deny a hearing for failure to comply with the regulations unless the study or analysis proffered is "totally deficient" in compliance. *Hynson*, 412 U.S. at 621 n. 17, 93 S.Ct. 2479 n. 17.

### B. *Role of Reviewing Court*

The Supreme Court charges the courts of appeals to monitor the FDA's application of its regulations to deny a hearing. It seems plain, as the FDA brief puts it, that the Supreme Court did not intend us to undertake a *de novo* review of the evidence upon which the Commission acted to deny a hearing. Certainly there is need to take into account the FDA's expertise.[2] Indeed, it is often not possible to understand, much less apply, the drug law and regulations without the benefit of technical knowledge that is not part of this court's working kit.[3]

When the court is asked to review the substantive determination of an agency, the test that defines its review—both its supervisory aspect, and its obligation of restraint—calls for affirmance if the agency's determination has a reasonable basis and has not been shown to be arbitrary or capricious.

While the court of appeals does not engage in technical dialogue with the agency, it does ensure that the agency has followed procedures conducive to a full airing of technical issues, and has "genuinely engaged in reasoned decision-making." *See* Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 393–394, 444 F.2d 841, 851–852 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971). The requirement of reasoned decision-making is usually articulated for decisions rendered after an evidentiary hearing, but it also has vitality for the decision rendered without a hearing. Indeed, that decision requires reasons not only for the disposition of the matters under consideration, but also for the conclusion

1. Section 505(e), as amended, 21 U.S.C. § 355(e), provides in relevant part:

 "The Secretary shall, after due notice and opportunity for hearing to the applicant, withdraw approval of an application with respect to any drug under this section if the Secretary finds . . . (3) on the basis of new information before him with respect to such drug, evaluated together with the evidence available to him when the application was approved, that there is a lack of substantial evidence

 that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof . . . . "

2. See Pfizer, Inc. v. Richardson, 434 F.2d 536, 546–547 (2d Cir. 1970), cited in Hynson, 412 U.S. at 622 n. 19, 93 S.Ct. 2479 n. 19.

3. See Bradley v. Weinberger, 483 F.2d 410 (1st Cir. 1973).

that the applicant's contrary position does not even present a genuine and substantial issue.

In its reviewing capacity the court is not to be hostile to the agency, but is rather to proceed in the context of a "partnership" between court and agency in furtherance of the public interest.[4] This is the model of the relationship envisioned in *Hynson*. In these drug efficacy cases the agency is permitted to adjudicate substantial rights in summary fashion, provided the court has assured itself the necessary preconditions exist: First, that the agency's regulations—its "articulated standards"—are sufficiently clear-cut to provide the "due notice" needed for a summary disposition. Second, that the agency's application of the regulations, and its determination that the study proffered as compliance is totally deficient, reflects "reasoned decision-making."

## II. PARTICULAR APPLICATION OF GENERAL PRINCIPLES: THE SUMMARY WITHDRAWAL OF APPROVAL OF THE NDA FOR PROTAMIDE

Examining Cooper's submissions to the FDA and the FDA's disposition of them, I do not feel that the agency's summary disposition comports with *Hynson*. In affirming the FDA, the majority, in my view, has exceeded the bounds of a court's role. To highlight my differences, I shall focus on the Baker study discussed in the majority opinion.

The matter before us is a new drug application for Protamide, for use with herpes zoster. In his study, "Use of Protamide in the Treatment of Herpes Zoster," published in the Pennsylvania

Medical Journal (63 Penn.Med.J. 697 (May, 1960)), Dr. Baker obtained dramatic evidence of Protamide's efficacy. Baker treated 44 patients suffering from herpes zoster, administering Protamide to 34 of the patients (30 adults and 4 children) and vitamin B–12 to the remaining 10 (adults). Therapy began as soon after the onset of herpes zoster as possible—some patients having sought treatment with more advanced symptoms than others—and continued for five to sixteen days, varying with the severity of the infection, with follow-ups for six months. Baker found that 94% of the patients receiving Protamide obtained "good to excellent" results, including symptom relief and shortening of the course of the infection. None of these patients suffered post-herpetic pain. By contrast, none of the control group receiving vitamin B–12 responded well to the therapy, and seven of the ten suffered some post-herpetic neuralgia. From these results, Baker concluded that Protamide had "marked therapeutic benefit" when administered prior to or at the time when lesions appeared in patients suffering from herpes zoster.

1. In dismissing the Baker study as "not well-controlled," the FDA gives only two reasons for its finding: (1) "the size of the control group is statistically inadequate;" and (2) "there is no raw data provided upon which a comparison of the test and control groups can be made." The first reason, as Judge Wright concludes, has no basis in current regulations, and therefore cannot trigger a summary disposition. This conclusion accords with the teaching of *Hynson*.

2. As to the second reason, the FDA rejected the Baker study because it lacks

4. See Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. at 393–394, 444 F.2d at 851–852:

The process thus combines judicial supervision with a salutary principle of judicial restraint, an awareness that agencies and courts together constitute a "partnership" in furtherance of the public interest, and are "collaborative instrumentalities of justice." The court is in a real sense part of

the total administrative process, and not a hostile stranger to the office of first instance. This collaborative spirit does not undercut, it rather underlines the court's rigorous insistence on the need for conjunction of articulated standards and reflective findings, in furtherance of evenhanded application of law, rather than impermissible whim, improper influence, or misplaced zeal. (Footnotes omitted).

raw data, even though existing regulations contain no requirement that a petitioner submit raw data as part of his study. Under *Hynson* this summary rejection is impermissible because it is not based upon a promulgated regulation. Petitioners point out that another study approved by the FDA as adequate and well-controlled (the Boundy study) was also lacking in "raw data." Judge Wright acknowledges this, but in effect drafts a "raw data" requirement that contains an exception which would justify both FDA rulings. He asserts that a petitioner must either describe the selection process whereby test and control groups were formed, or must submit sufficient raw data to allow the agency to decide whether the test complies with its conception of an adequate and well-controlled investigation. The difficulty, however, is that FDA has not promulgated a particularized regulation containing the requirement developed by Judge Wright. And summary judgment is only proper, under *Hynson*, when the petitioner has failed to present material required by a regulation it was on notice to satisfy.

3. To remand to the FDA for compliance with the *Hynson* guidelines is not to "exalt form over substance," as Judge Wright says, but is to insist on fair process. A court does not skimp fair process because of its view of the merits. We would all agree that if the issue were one of due process in a criminal trial, we would not skimp fair procedure merely because the evidence clearly showed the defendant was guilty. The values involved in an administrative agency proceeding are different, of course, but the need for process that is fair is too important to water down.

4. Judge Wright's misapprehension of the judicial role is highlighted by his ruling—notwithstanding a total lack of any FDA comment on Baker's use of vitamin B–12 as a control substance—that FDA's Order "plainly implies disapproval" of that usage. The sole basis for this ruling is the FDA's use of "disparaging" quotation marks around the word "control."

This exercise reverses the roles of agencies and courts. It is the agency's job to decide whether a study is adequate or not and, if not, to state the reasons. When there is no hearing, and the agency's stated reasons are not satisfactory, a court cannot sustain an order by conjecturing about unstated inferences. Ultimately the court lacks the capacity to develop its own analysis concerning the adequacy of the study.

Thus, notwithstanding Judge Wright's reconstruction, the FDA's placing of "control" in quotation marks seems to me entirely consistent with the two reasons expressly given in the Order, statistical inadequacy (rejected by Judge Wright) and lack of raw data (discussed above).

There are good reasons why a court should confine itself to a review of the reasons the agency itself gives for the actions it takes. Agencies are weakened, not strengthened, if they can bypass their responsibilities and look to a sympathetic reviewing court to shoulder them. There is also the danger that the court's inferences, and construction of regulations, will differ from the agency's. When this happens, even clear-cut regulations become fuzzy, and their utility as "due notice" may be vitiated. Judge Wright's treatment of vitamin B–12 brings us to this potential problem.

Judge Wright attributes to FDA a reason not stated in the Order, that B–12 was an inappropriate control, in view of the regulation stating, *inter alia*, that a control substance must be either "an inactive preparation"[5] or "[a]n effective regiment [sic] of therapy."[6] Judge Wright concludes that vitamin B–12 fits neither description because Baker originally felt it might be somewhat helpful, a category different from those described in the regulation. Although Baker later decided that vitamin B–12 was in fact ineffective against herpes zoster, Judge Wright asserts that

5. 21 C.F.R. § 130.12(a)(5)(ii)(a)(4)(ii).

6. 21 C.F.R. § 130.12(a)(5)(ii)(a)(4)(iii).

"this limited experience hardly renders the substance a known inactive preparation. . . ." But the regulations do not specify a requirement of prior knowledge of some specified experimental data on which to base the required designation of inactivity.

The dangers of judicial interjection are not mere word play. Indeed, it is my own intuition—for neither Judge Wright nor I have the material for a reasoned inference—that the FDA carefully avoided resting its decision on the ground that B–12 was an inadequate control within the meaning of the regulations cited by Judge Wright. The FDA may have been of the view that B–12 was an inactive preparation in present context, for all practical purposes, or it may have concluded that for study purposes it was not necessary to resolve whether B–12 was (a) inactive, as Baker finally concluded, or (b) helpful, as he at first premised, because the utility of B–12 as an adequate control was sufficiently established by the high probability that it was not a harmful substance.

Alternatively, the FDA may have concluded that any technical problems associated with use of a B–12 control could not fairly be used as the basis of decision because it was unlikely to account for the dramatic benefit shown by the Baker study in favor of petitioner's product in comparison with B–12. The nature of the results may have a bearing on the adequacy of a study. The dramatic results obtained by Dr. James Lind with administration of citrus fruit to only two scurvy-ridden sailors, out of a group of twelve, established this classic medical study of the 1740's. FDA's silence may well betoken the view that use of a beneficial substance, though not strictly "inactive," would not realistically undercut the validity of Baker's experiment.

The natural question that occurs to me—and I must think about this without the benefit of any reasoning from the FDA—is why a study is plainly not "adequate," is too insubstantial for serious consideration, merely because the "control" used is a preparation that may be generally productive of well being, even though it is neither an inert placebo nor an "effective regimen of therapy." I don't think this is the time or place to debate the validity of the FDA's regulation as such, but I can see good reasons why the FDA would hesitate to lay it on the line in a case involving B–12.

I see particular problems for the FDA, in any rigidity concerning the requirement for an inert control substance, when the drug being tested is designed to relieve pain, as is Protamide, in view of striking analgesic effect assigned by authoritative medical research to placebos. A much-cited work reviewing pertinent studies concludes that in one-third of a patient population, a placebo will relieve severe pain as well as either morphine or aspirin, an impressive statistic, especially alongside the fact that one-fourth of that same population will obtain no relief from either the drug or the placebo.[7] To avoid misunderstanding, I am not suggesting that FDA must or should forgo attempts to ascertain the efficacy of purported analgesic drugs, or that the "placebo effect" necessarily vitiates the validity of the FDA regulation here in question. The point is that the methodological complexity of the various medical research issues involved in drug testing should make the courts hesitant in venturing judicial reconstruction of reasoning which FDA omitted, or in supposing, without benefit of any expertise, that the underlying principles of drug testing are so well-settled, widely known and agreed upon that the FDA's conclusory statement of a deficiency reflects a pal-

7. H. Beecher, Measurement of Subjective Responses 65–72 (Oxford University Press, 1959). Beecher points out that experimental designs can and should take account of

the "placebo effect," but this court is certainly not the proper forum for a *de novo* consideration of experiment-design issues, or their implications for the Baker study.

pable shortfall that does not merit a hearing of any kind.

5. In sum, I find no reason in the FDA's Final Order rejecting the Baker study which satisfies the guidelines announced in *Hynson*. As to the case at hand, the FDA is not powerless to act; what is required is that it act after opportunity to explore the adequacy of Baker's methodology. Even without a particularized regulation, the FDA can structure a hearing that requires petitioner to produce Baker's raw data, and to offer evidence on the issue whether his study is "adequate and well-controlled."

## III. OPPORTUNITY FOR RESPONSIVE RECONSIDERATION

As a court, we are charged to oversee FDA's use of a summary procedure so as to be responsive to the agency's need for expedition, yet avoid deprivation of substantial rights without hearing. While we must defer substantially to the agency's exercise of technical judgment, we must have assurance that the agency is following a procedure that guards against abusive use of its power, and assures full access and input.

In my view, modest changes in current FDA procedures would allow us to defer to agency expertise while receiving the assurance we require. These changes would also recognize the difficulty of constructing regulations particularized enough to meet the *Hynson* standard, yet broad enough to be generally applicable. As matters now stand, the FDA notifies an NDA holder that his product has been found "ineffective or possibly ineffective." This notification is quite summary in nature, and is generally the product of a concise ultimate finding by the NAS–NRC review panel. Thereafter, the manufacturer must submit "substantial evidence" consisting of "adequate and well-controlled studies" in order to overcome the presumption of ineffectiveness established by the FDA and NAS–NRC findings. The FDA then responds to these studies with its final declaration. Often this is

a bare conclusion that the submitted studies are not adequate and well-controlled, that no material issue of fact has been raised, and that a hearing is denied and approval of the NDA is withdrawn.

A central difficulty is that FDA is engaged in fleshing out general regulations with concrete applications. This is fair enough. What may not be fair is a system of particularization without hearings, letting applicants know after the fact that they were in default all along for failure to observe a requirement that had not yet been spelled out. And when FDA is administering regulations that are in some measure "imprecise," "subjective," or lacking in "clearcut definition," there are elements that militate against disposition without a hearing. *Hynson*, 412 U.S. at 421 n.17, 93 S.Ct. 2479 n. 17.

The first move toward untying the tangle could be taken if the FDA allowed the petitioners an opportunity for at least a written response to the determination that is now issued as the FDA's final order, but which, under a change in procedure to cope with the problem, would become a proposed disposition. At that time, NDA holders would, for the first time, have the FDA's declared approach for rejection of the study, and have a genuine opportunity to respond to that approach. Such a procedure would open up the process toward a reasoned decision based on fair opportunity for input. Perhaps petitioners could supplement the studies, say, by provision of raw data, if that were identified as a need. Or perhaps they could point out flaws in the FDA's approach.

It may be that such a response by the applicant would lead FDA to schedule a hearing. This is not an unthinkable calamity. We are not discussing a situation where the applicant is relying merely on subjective presentations that amount in essence to mere "anecdotal evidence indicating that doctors 'believe' in the efficacy of a drug"—a submission that would confute the legislative

approach that mere "impressions or beliefs of physicians, no matter how fervently held, are treacherous."[8] Such subjective presentations have no serious claim to consideration as substantial evidence of a controlled study. But when we come to what purport on their face to be studies with a control element, conducted by persons who have at least a prima facie claim to expertise, then we have a matter that calls for resolution after hearing. The "hearing" appropriate for such cases need not borrow the characteristics of conventional courtroom controversy, burdened with the impedimenta of the kind of arcane questions with which lawyers often bedevil expert witnesses. Marine Space Enclosures v. FMC, 137 U.S.App.D.C. 9, 420 F.2d 577 (1969).

As *Marine Space Enclosures* points out, even when statutes contemplate an adjudicatory hearing baseline, a particular case may involve the kind of issue that calls for an oral argument rather than an evidentiary hearing[9] or for a legislative rather than an adjudicative hearing.[10] These comments are highly pertinent when what is at issue are technical questions of methodology. Indeed, in such a case the reality of technical dialogue and interchange of view can perhaps best be provided by an on the record conference-hearing procedure, modeled on conference discussions between lawyers and experts.[11] The law does not require a bog-down at the agency level, it seeks only an opportunity for reasonable give and take. If the hearing officer is worth his salt, he can keep counsel and experts to the business at hand in a straight-forward way.

If the applicant's response to the proposed disposition, in the procedure outlined above, is thought by the FDA to be so palpably shallow as to permit the agency to take final action without any further proceeding, the agency would at least have the benefit of a more focused record which, hopefully, would foster reasoned findings in place of bare conclusory statements. And there would be generated the kind of record that makes minimum judical review, without a *de novo* inquiry, a meaningful assurance.

In my view, there should be a remand to require that petitioners be given such an opportunity to make a presentation at the administrative level.

## ON PETITIONER'S PETITION FOR REHEARING

### ORDER

On consideration of petitioner's petition for rehearing it is

Ordered by the Court that the aforesaid petition is denied.

Statement of Circuit Judge LEVENTHAL as to why he voted to deny rehearing.

I have decided not to vote for rehearing, nor to ask the court to vote on the suggestion of rehearing en banc, primarily because the court is heavily burdened at the present time, and because it is my judgment that the combined effect of my dissent and of Judge Wright's caveat to the majority opinion will result in a different course at the administrative level in the future. I am fortified in this judgment by a reading of regulations issued March 13, 1974,[1] in which the FDA sets forth a modification of its summary judgment procedures in contemplation of compliance with our *Hess & Clark* opinion.[2] This does not help the appellant, who is governed by a disposition that I think is a mistake; but the appellant can perhaps obtain some relief by submission to FDA of a

8. Hynson, *supra*, 412 U.S. at 619, 93 S.Ct. at 2478.

9. 137 U.S.App.D.C. at 21, 420 F.2d at 589.

10. *Id.* at 22, 420 F.2d at 590; see also Holm v. Hardin, 145 U.S.App.D.C. 347, 449 F.2d 1009 (1971).

11. American Airlines, Inc. v. CAB, 123 U.S. App.D.C. 310, 316 n. 18, 359 F.2d 624, 630 n. 18, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

1. 39 Fed.Reg. 9750 (Mar. 13, 1974).

2. Hess & Clark, et al. v. FDA, 161 U.S. App.D.C. 395, 495 F.2d 975 (1974).

new set of studies. More importantly, there is a difference between a mistake in an individual case and a mistake that will affect ongoing policy, and it is my perhaps optimistic judgment that the net result of this case will be confined to the facts presented. I should like to give notice, however, that the requirements of fair procedure voiced in my dissent are still a part of my working kit of judicial review, and that if my present estimate does prove to be optimistic, I shall not hesitate to call upon the court for a full dress reconsideration.